SCOTT *v.* BAIRD.

1. BOUNDARIES — PRACTICAL LOCATION — AGREEMENT AND ACQUI-
    ESCENCE OF PARTIES—EVIDENCE—QUESTION FOR JURY.

> In ejectment depending on the location of the center line of a
> certain lot, evidence examined, and *held,* that whether the
> owners of the lot and the one adjoining had not fixed the
> boundary between them by mutual agreement and acqui-
> escence was a question for the jury.

2. TENANCY IN COMMON—RIGHTS OF CO-TENANTS — PURCHASES —
    INUREMENT TO CO-TENANTS.

> Where a tenant in common of a city lot purchases from the
> owner of the adjoining lot a strip of land on which a wall is
> built parallel to, but some distance from, the boundary of the
> lots as shown by the plat, together with the right to use the
> wall as a party wall, any right he acquires to use the space
> intervening between the boundary of the lots and the wall
> inures to his co-tenants.

3. BOUNDARIES — PRACTICAL LOCATION — TENANTS IN COMMON —
    ESTOPPEL.

> In ejectment depending on the location of the center line of
> a certain lot, formerly owned in common by the parties and
> voluntarily partitioned by them by deeds reciting the center
> line as the dividing line, evidence examined, and *held,* that
> whether defendant was estopped to deny that the walls stand-
> ing on either side of the land were party walls and marked
> the boundaries of the lot was a question for the jury.

4. SAME—EVIDENCE—ADMISSIBILITY.

> Plaintiffs having acquired their title at a public sale at which
> defendant was present, evidence that the officer making the
> sale stated that he was selling an undivided half of the land
> between the walls, and that defendant made no objection,
> was admissible.

CARPENTER, C. J., and GRANT and HOOKER, JJ., dissenting.

Error to Ingham; Wiest, J.    Submitted  October  12,
1905.   (Docket No. 43.)   Decided July 23, 1906.

Ejectment by Ira Scott and William O'Connor against

James J. Baird. There was judgment for defendant on a verdict directed by the court, and plaintiffs bring error. Reversed.

This is an action of ejectment to recover a strip of land 6 inches wide and 157 feet long from the south side of the north half of lot 4, block 83, of the city of Lansing. Orlando F. Barnes, the owner of the entire lot, on August 19, 1889, deeded an undivided one-half to defendant Baird, and the other undivided one-half to Nelson Bradley. On September 27, 1900, plaintiffs became the owners of Bradley's interest at a public sale of the assets, of the People's Savings Bank. On June 3, 1903, plaintiffs and defendant made a partition of this lot, defendant taking the south half and plaintiffs the north half thereof. These deeds recited an agreement:

"That the center line of said lot, running east and west, may at any time hereafter be used for a partition wall by either party, their heirs or assigns; said line to be the center of said wall," etc.

There were brick stores on the north and south of this lot; the lot being vacant except as to a small wooden structure upon the south half.

Defendant Baird employed a surveyor and located the center line of the lot in accordance with the original plat of the town of Michigan, afterwards the city of Lansing. In making this survey and in locating the center line the surveyor adopted the original monuments. The town of Michigan was platted in 1847. This plat included section 16 on which lot 4 is located. The specifications attached to the plat of the town of Michigan, made in 1847, provided that:

"The point from which all measurements are to be made upon section 16 is designated by a cross cut in the end of a stone planted one foot below the surface of the ground on the west line of Washington avenue in the center of Michigan avenue," and "the landmarks which govern the survey and plat of this town are two stones planted one foot below the surface of the ground upon the

west line of Washington avenue, one of which is in the center of St. Joseph street, and the other in the center of Saginaw street."

Block 83 lies between Ionia and Shiawassee streets and is bounded on the east by Washington avenue, it is the third block north of the intersection of Washington and Michigan avenues. There are six lots in the block fronting on Washington avenue, numbered from 1 to 6, from Shiawassee to Ionia streets; lot 6 being bounded on the south by Ionia street and on the east by Washington avenue. The brick store building on the north of lot 4 was erected in 1885 by Barker and Parker, and is known as the "Barker Block." The brick building south of lot 4 was erected by one Hinchey in 1891. In 1879 he built two stores on the south part of lot 5. In 1859 one Ephraim Longyear erected a brick building on the south one-third of lot 6. The land at that time was comparatively unsettled, the streets had been laid out, but had not been graded. Ionia street had been cut out through the woods six blocks west of Washington avenue. Washington avenue between Ionia street and Michigan avenue had not been graded, but was opened and some business houses erected along it. The county surveyor, named Preston, was employed by Mr. Longyear to establish the lines for the building to be erected by him. In fact, the south line of that building encroaches upon Ionia street about 15 inches. It has been occupied as a business block since its erection, and no change has been made in its location. All the store buildings erected on lots 5 and 6 — and both lots are covered with buildings—are located too far south, and their lines were evidently located with reference to the south line of the Longyear or Buck building. When Mr. Hinchey erected his buildings on lot 5 in 1879, he took the southeast corner of the Longyear building, now the Buck building, as the starting point, and when, in 1891, he erected his north building, his north wall was placed entirely upon his own lot, and a few inches south

of the south line of lot 4, according to the original plat and monuments.

After Barker and Parker had erected their building on the north of lot 4, they discovered that they had encroached upon lot 4 about 15 inches. On November 15, 1893, defendant, Nelson Bradley, Orlando F. Barnes, and their wives executed a deed to Mr. Barker, the then owner of the Barker Block, of— .

" The undivided one-half interest in and to a strip of land described as follows, to wit, the north 15 inches of lot 4, block 83, city of Lansing, Michigan, except west eight feet which has heretofore been deeded to the city of Lansing for alley purposes. This deed is given to establish the wall line between the lands of the parties hereto, and particularly the south wall of the brick block known as the 'Barker and Parker Block,' occupying the east 90 feet of the above-described premises, and to vest in each of the parties hereto, their heirs and assigns, the said wall and land."

Then followed certain provisions in regard to the use of the wall and land in case of destruction. It contained also the further provision :

" It is understood and agreed that the parties of the first part, from and after the execution of this deed, are the owners of an undivided one-half of the wall now upon the land in the deed described, and entitled to the use thereof."

That deed was in the abstract of title, and was known to the plaintiffs. In 1903 Mrs. Hinchey and her children, Mr. Hinchey having died, gave a deed to defendant Baird containing the following description :

" Commencing at a point on the west line of Washington avenue 131 feet and 6 inches north of the north line of Ionia street, as now marked by the face of the south wall of Buck's furniture store, running thence west in center of wall 80 feet, thence north 6 inches, thence east on the north side of wall 80 feet to Washington avenue, thence south six inches to place of beginning. This deed is given to establish and confirm a party wall, as now located on the lands described. If in future either of joint

owners wishes to extend the wall to the west on same line and shall pay more than one-half of the total cost thereof the owner not building shall before using such wall so extended pay to the other the one-half part of the total cost of it."

In making the partition, defendant paid plaintiffs $75. The parties disagree as to the reason for this payment. The reason, however, we think immaterial.

In directing a verdict, the circuit judge concisely stated his reasons therefor, as follows:

"The town of Michigan, now the city of Lansing, was established by the State commissioners in the year 1847. The school section was platted by this authority. Block 83 commences two blocks north of the center of section 16. For the purpose of making certain the courses, lines, and distances controlling the plat of the new town, certain permanent monuments or measuring points were fixed, and the three with which we are concerned were fixed, respectively, one in the center of Michigan avenue, on the west line of Washington avenue; one in the center of Saginaw street, on the west line of Washington avenue, and one in the center of St. Joseph street, on the west line of Washington avenue. These, being the original starting points of the surveys establishing lots and blocks, must control now, as they did then, unless their location is uncertain or long practical location of lots or common acquiesence has made some other place or point the thing that should control, for the reason that, in fact, it has been considered and acted upon as controlling, and therefore has controlled.

"When Mr. Longyear endeavored to find the south line of lot 6 of block 83, at the time he started to build in 1859, he alone was interested, and his private want and act in no way changed permanent monuments or affected the other lot owners in the block. Mr. Preston, the county surveyor, in giving him the line, acted in no official capacity so as to bind the other lot owners, and could not legally change or modify the true distance from the original monument. Nothing but long acquiescence in the line so established by all affected thereby could authorize the adoption of such lines. * * *

"Mr. Preston made a mistake and got the line of lot 6 too far south, but that mistake only affected lot 6. Later,

the owners of lot 5 appear to have acquiesced in the location of lot 6, but the owners of lot 4 have never precluded themselves from denying that the location of lots 5 and 6 located lot 4 according to the same mistake.    The owners of lot 4 were not concerned with the location of lots 5 and 6, for the reason that their location did not encroach upon lot 4.    When the owners of lot 3 located their lines substantially in accordance with the mistaken ones of lot 5 and 6 and encroached upon the lines of lot 4, was the first the owners of lot 4 were called upon to repel the assumption that the Preston survey established true lines, and this was done, and the Preston survey repudiated by the owners of lots 3 and 4, when the owners of lot 4 deeded to the owner of the south one-third of lot 3 the undivided one-half of the north 15 inches of lot 4 for the purposes of a party wall, and for the reason that it was then, or some part of it, was occupied by the wall the owner of lot 3 had erected.    The owners of lot 4 have not been shown to have acquiesced in the acts of other lot owners following the Preston survey, and I am of the opinion that no such acquiescence has been shown in the lines of the Preston survey as makes the lines adopted by the owner of lot 6 controlling upon any other lot owner unless, possibly, upon the owner of lot 5.    Ever since the establishment of the plat the location and lines of lot 4 could any day have been ascertained and determined to a certainty from the original monument and in the way specified in the plat.    Not only this, but the location of lot 4 has for many years been understood.    Barker understood he had encroached upon lot 4 with his wall when he purchased a wall easement in 1893.    Hinchey understood the Buck line was untrue when he built his north wall upon his own land and told Buck his store was in the street. Buck has known his south line should not control others from the day he learned his building encroached upon the street.    Mr. Haze knew it when Thoman built next his line on lot 3 and left a space between his ancient fence and the wall then erected.    Mr. Thoman knew it, for he says he knew when he built he was south of the north line of lot 3 some 14 inches.    Baird, Barnes, and Bradley knew it when they granted Barker the easement on lot 4 for his encroaching wall. ' In the face of this knowledge of the Preston mistake, it cannot be said there has been such an acquiescence among the owners of lots in this block as to establish the Buck building the testing point from which

to run lines and measure distances.   The Buck line was a. mistake, and has been recognized as such for years, and while it may be the line as between those who have acquiesced in it, it has not become the monument from which all lots on that side of the block are to be located.

" The monument at Michigan avenue has never been superseded by any other, so far as the proof shows, regarding lot 4 and measurements from it confirmed by the ancient Haze fence and other points in evidence show that defendant has not built the center of his wall north of the east and west center line of lot 4."

*Thomas, Cummins & Nichols,* for appellants.

*Person & Person,* for appellee.

GRANT, J. (*after stating the facts*).   1. The center line of lot 4 as claimed by the defendant and upon which he has constructed his party wall under the terms of the partition deeds is a line established by the original plat and monuments fixed by the plat.   The surveyors, in locating the line, started from the monument in the center of Michigan avenue and measured northward to the center of lot 4 according to the plat.   They verified this measurement by another from the established monument in Saginaw street.   The two exactly agree.   The lots west of the alley of block 83 correspond substantially with the original plat.   The line between lots 10 and 11 west of the alley correspond with the line between lots 2 and 3 east of it.   On this line between lots 10 and 11 there has existed for 25 years an old fence.   This line corresponds with the surveys from the known monuments and is in accord with the original plat.   The location of lot 4 as claimed by the defendant is beyond dispute the location originally established.   This location must prevail unless the parties interested have acquiesced in another one.   Plaintiffs claim that the monument from which the measurement of the lots in block 83 is to be determined is the corner of Ionia street and Washington avenue as it was marked and defined by the old Longyear building, 12 years after the making and

recording of the town plat. They therefore claim that they are entitled to one-half of the open space between the south wall of the Barker block and the north wall of the Hinchey block. This open space is 65 feet 2 inches in width. Under their claim they would therefore obtain 32 feet and 7 inches of open space. They also concededly own the undivided one-half interest in the 15 inches of the north part of lot 4 under the partition wall, as deeded by the owners of lot 4 to Mr. Barker. They have the absolute use and benefit of this wall for building purposes, while defendant upon the south would not have the benefit of the partition wall except as he purchased it from the owners of the Hinchey block, because the north wall of the Hinchey block stands exclusively within lot 5. The Longyear or Buck building clearly encroaches upon the street. Its location was undoubtedly a mistake; whether of Mr. Preston, the county surveyor, or the failure of Mr. Longyear to build in accordance with the line which Mr. Preston gave him, does not appear, and is immaterial. There is no evidence that any stakes were placed along Ionia street, and if any were placed, there is no presumption that they existed when the Longyear building was erected, 12 years after the land was platted. Only those who have acquiesced in such location are bound by it. The only ones who have acquiesced in it are the owners of lots 5 and 6 and the buildings thereon. Their acquiescence can bind no one else. It was many years ago understood that the Buck building encroached upon the street. There is no proof that the owners of lot 4 acquiesced in changing the north line of Ionia street, and thereby changing the location of their lot. On the contrary, whenever the original location was attacked they have asserted their rights. When Barker and Parker ascertained that they had encroached upon lot 4, they purchased a half interest in the north 15 inches of lot 4 in order to secure the maintenance of the partition wall which they had there erected. Holding to the original plat does not disturb the location of any other street or

block in the city. Neither does it disturb or affect the rights of the owner of any lot in block 83. The owners of lots 5 and 6 have acquiesced in the encroachment. So evidently has the municipality. These lines cannot now be disturbed. The boundaries of no other lots are injuriously affected.

The case does not fall within *Koenigs* v. *Jung*, 73 Wis. 178, and similar cases, where the location of blocks, lots, and adjacent streets has been made by official engineers of a city, the streets graded and improved and buildings erected with reference thereto, although a new survey showed them to be incorrect. Neither does it fall within *City of Racine* v. *Plow Co.*, 56 Wis. 539, where the new survey resulted in changing the lines of streets, blocks, and lots from those which had been generally and uniformly recognized and acquiesced in. Neither does it fall within those cases cited by plaintiffs where land is described in deeds bounded by a highway in which it is presumed that the deed referred to the highway as it existed at the time of the execution of the deed, and not as shown by the record of the survey. No street or highway is referred to in any deed of any of the lots in block 83. The presumption is that every one sold and purchased his lot in accordance with the original plat and the monuments thereby established. Until cogent evidence can be produced to show that owners of lots have acquiesced in other monuments, and in a change of the plat, the original must prevail.

Counsel cite as applicable to this case the following statement from *Twogood* v. *Hoyt*, 42 Mich. 609:

" So, where the streets, although not so designated, have by the parties interested or by the public authorities been opened, used, and acquiesced in, they thereby become permanent boundaries, and form new starting points in subsequent surveys of the premises."

The statement was not essential to the determination of that case. In any event, it has no application here. The south line of the Longyear or Buck building was not lo-

cated by the public authorities. It was very soon under-
stood by all parties that that building encroached 15 inches
upon the street. The only parties who have acquiesced in
it are those who have built on lots 5 and 6. It is not in
the power of one individual to encroach upon a public
highway, even with the acquiescence of the public author-
ities, and thus establish a new monument or starting point
by which all the other owners in a given block must locate
their lots and set aside all the established monuments.
The same reasoning applies to the following statement in
*Van Den Brooks* v. *Correon,* 48 Mich. 283.

"Where, however, streets have been opened and long
acquiesced in, in supposed conformity to the plat, they
should be accepted as fixed monuments in locating lots or
blocks contiguous thereto or fronting thereon."

The question in that case was not an encroachment by
one lot owner upon the street, but the location of the streets
of the city. If the contention of the defendant in that
case had been sustained, it would have resulted, as the
trial court instructed the jury, in changing the location
and boundaries of many streets and blocks in the city.
The statement was applicable to the facts of that case.
In this case, by adhering to the original monuments,
neither the rights of the public in the streets nor the boun-
daries of any other lot or block are affected. There is no
evidence of any existing stakes at the time the Long-
year building was erected, 12 years after the survey of the
plat. All the other streets are of the width established by
the plat. If presumptions were to be indulged in, it would
be that the original surveyors platted Ionia street of the
same width as the others. We held in *Woodbury* v.
*Venia,* 114 Mich. 251:

"Monuments control courses and distances, and that,
when monuments and measurements vary, the monu-
ments always control; but this reference is to monuments
and measurements made by the original survey. Courses
and distances would not be controlled by monuments
made by some person unauthorized to make them."

By locating lot 4 according to the established monuments each of the parties acquired one-half of the lot which was 66 feet wide, the width of the lot as established by the plat. Either of the theories advanced by the plaintiffs makes a lot more than 66 feet wide.

2. It is, however, insisted that there is evidence which should have been submitted to the jury, that the Hinchey wall was a practical location by the owners of lots 4 and 5 of the boundary line between them, that the defendant acquiesced therein and is now estopped from disputing it. A party wall is "a wall built upon the dividing line between two adjoining properties, usually having half its thickness on each property." As described by Washburn it is a wall erected on a line between two adjoining pieces of land, belonging to different persons, for the use of both properties. 2 Washburn on Real Property (6th Ed.), § 1300. The erection of such walls is in some States regulated by statute, giving one owner the right to build the wall one-half upon the land of each. In the absence of statutory regulations, each party must build his wall upon his own land, unless he makes an agreement with the adjoining owner to build one-half upon the land of the other. Otherwise such a wall can exist only by prescription. *Whiting* v. *Gaylord*, 66 Conn. 337.

Acquiescence is "the tacit concurrence by one in the act of another." The act to be acquiesced in must be an act which is advantageous to one of the parties and detrimental to the other. When a party erects the wall of his building upon his own land he conveys no easement to the adjoining owner. Such an easement is an interest in land which can be conveyed only by deed. Mr. Hinchey had no conversation or agreement with any of the owners of lot 4 as to erecting his wall as a party wall. On the contrary, the evidence discloses that he knew that the lines south of his lot were too far south, and that the Buck building encroached upon the street. He then said that he was building his wall on his own ground. The stone foundation underground extended several inches north of

the brick wall above ground. There was nothing for eitheir party to acquiesce in. There was no occasion for either to speak. None of the owners of lot 4 had claimed it as a party wall. Defendant Baird recognized that it was not a party wall, and purchased the right from the heirs of Mr. Hinchey to make it one. If it had been established and acquiesced in as a party wall there would have been no occasion for a deed to establish it. The only testimony of any conversation between Mr. Hinchey and the owners of lot 4 is that of the defendant, who testified:

"He (Hinchey) made a verbal arrangement which was never put in writing, that the use of that wall could be got for a building on lot 4. He died before it could be reduced to writing. The parties to that arrangement were Mr. Barnes, Mr. Hinchey and myself."

This shows conclusively that there was no claim that Mr. Hinchey erected his wall as a party wall, or that either he or the then owners of lot 4 acquiesced in it as a party wall. All the parties understood that the owners of lot 4 had no interest in it, and could only acquire it by deed, or by some agreement with Mr. Hinchey. Mrs. Hinchey's supposition or understanding is not competent evidence. The erection of a party wall upon the south line of lot 4 according to the recorded plat would leave a space a few inches wide between the two walls, which would not only be no benefit to either, but a damage to both. Mr. Hinchey as a reasonable man might be willing to arrange with the owners of lot 4 to make that a party wall. Until he had done so by deed or by occupation on the part of the owners of lot 4 for sufficient length of time to estop him, he had lost no right to this narrow strip of land, and the owners of lot 4 had gained no title to it. Recognizing this, the defendant by deed of purchase acquired the right to use the Hinchey wall as a party wall. The deed recited: "This deed is given to establish and confirm a party wall as now located on the lands described." This deed constituted, in my opinion, the first and only establishment of a party wall on the south of lot 4. The

effect of it was not only to establish this wall as a party wall, but it also conveyed to the defendant the perpetual use of, if not the title to, this narrow strip of land between the Hinchey wall and the south boundary line of lot 4.   Without the use of this narrow strip by the defendant the grant would be useless.   The grant of a thing necessarily carries with it that which is necessary to its enjoyment.   14 Cyc. p. 1166; 10 Am. & Eng. Enc. Law (2d Ed.), pp. 420–424; *Lanier* v. *Booth*, 50 Miss. 410; *Collins* v. *Prentice*, 15 Conn. 39; *Powell* v. *Sims*, 5 W. Va. 1; *Mead* v. *Anderson*, 40 Kan. 203.

In *Collins* v. *Prentice* it was said:

" The law will not presume that it was the intention of the parties, that one should convey land to the other in such manner that the grantee could derive no benefit from the conveyance."

The concession made by defendant's counsel that Mr. Sparrow, the grantee from the heirs of Mr. Hinchey, of the north part of lot 5, still owns this strip and may recover the same, is not the law.   The heirs of Mr. Hinchey, in conveying to Mr. Sparrow, conveyed the land—

"Subject to the right of James J. Baird in the ownership of the north half of the brick wall standing on the north line of said lands, the center line of said wall being the dividing line between the lands above conveyed, and the said Baird land on the north."

They could only convey subject to their former deed. Mr. Baird's grantors could not in a subsequent deed to Mr. Sparrow make any recitals binding upon Mr. Baird or any other parties interested in this controversy.

It is stated in my Brother BLAIR's opinion that the offer of testimony to show that the receiver in selling the property at auction stated that the property was between these two walls, and that they would have to build no walls except a cross-wall, was improperly rejected.   This allegation of error is not discussed in plaintiffs' brief, and might therefore be considered as waived.   If, however, the question were properly before us for decision, the rul-

ing, in my judgment, was correct.  The receiver could not by any ipse dixit of his change the boundary lines of lot 4 which he was selling.  He could not by his statement take away any interest in the north wall, or convey any interest in the Hinchey wall.  He could not sell any more than lot 4, and yet, if the contention of the plaintiffs be maintained, lot 4 was more than 66 feet in width.  It was true that the purchaser would have to build no party wall upon the north.  It was not true that the purchaser would have any right to use the Hinchey wall.  The receiver was selling lot 4, according to the recorded plat, a lot 66 feet wide.

Plaintiffs must be held to have known that the north boundary line of lot 4 was 15 inches north of the open space, for that fact appeared upon the record in the office of the register of deeds and upon the abstract of title, and plaintiff Scott admits that he so understood it.  They had no reason to believe, from the examination of the records or from the statements of any one interested, that the owners of lot 4 had any title to, or easement in, the Hinchey wall.  The receiver could by no statement of his convey such an interest.  The defendant's land was not being sold.  He was not called upon to speak.  The proposed testimony did not injuriously affect his rights, or prevent him from subsequently purchasing lot 5 or any part thereof, and insisting upon the true boundary line.

Plaintiffs gave evidence tending to show that when the partition was agreed to, the defendant stated that the Hinchey or south wall was three stories high, and the north or Barker wall was two stories high, and that he would give $75 for the south half of the lot because of the additional height of the Hinchey wall.  It is due to the defendant to say that he denies this conversation.  He testified that plaintiff O'Connor said that the man who took the south half should give the one who took the north half $75, and that defendant might have his choice.  The Hinchey wall was three stories high and 65

feet long, the Barker or north wall was two stories high, and 90 feet long. If the determination of this controverted question of fact would be determinative of the case, or, in other words, if such statement would estop the defendant to assert the true line, the case should be reversed. As already shown, the owners of lot 4 had obtained no right to or interest in the Hinchey wall. They had no right by prescription, because they had not been in actual use of the land. No controversy had ever arisen between the owners of lots 4 and 5 as to the boundary line. If the owners of lot 5 were not estopped to assert the true line according to the recorded plat, how can a purchaser from them be held estopped? The owners of lot 5 had the right to use or sell and convey an interest in the Hinchey wall, and as well the narrow strip north of it belonging to lot 5. Title to land cannot be acquired in this State by estoppel. If, therefore, the owners of lot 5 had a complete title to the land in dispute, their grantee would take the same title, and could be no more estopped than would be the grantors. Boundary lines and party walls cannot be established in the first instance by parol, or rest in the uncertain memory of witnesses. Only when a boundary line has been agreed to and fences or walls built in accordance with the parol agreement is there room to apply the doctrine of acquiescence. The danger of relying upon the uncertain memory of witnesses in such transactions is apparent from the testimony of the three witnesses for the plaintiffs, who do not agree upon this conversation.

3. The record presents one other question. In purchasing a portion of the Hinchey wall from the Hinchey heirs, should the defendant be held to have acted in behalf of his co-tenants, or for his own benefit? If acting for them, he holds the property in trust. It is above shown that the receiver owned only one-half interest in lot 4 according to the recorded plat, a lot 66 feet wide; that he was selling the undivided one-half interest in that lot; that no statement of his could change the boundary line; that no interest of defendant was being sold, and he was

not obliged to be on guard to watch and protest against any statements which the receiver might see fit to make. The title to the land south of the south boundary line of lot 4 as above determined was in entire strangers. Any one could purchase a foot or more, and take title as against all the world. Neither of the tenants of lot 4 was prohibited by any principle of law from purchasing any portion of lot 5 for himself alone. Whether the defendant made this purchase before or after the parol arrangement was made for a division of lot 4 is in dispute. That question, however, is immaterial. All knew or should have known the boundary line of lot 4. Each stood at arm's length as to the other, and each had a right to purchase an interest in lot 5 in anticipation that in the division he might obtain the south half of lot 4. Plaintiffs, under their own showing, had no knowledge that defendant had bought the interest from the Hinchey heirs. They took no action in reliance upon such purchase. The legal status of the parties was therefore unchanged by it. The act of defendant in this purchase was not an act relating to the common property. It was not in confirmation of any right or easement previously existing and belonging to the common estate. If defendant had purchased the entire of lot 5, would he be held to have purchased it, or any part of it, in the interest of the joint owners of lot 4, and to have made that a party wall which no one before had either used or made one ? The conveyance from the Hinchey heirs for which the defendant paid a valuable consideration was a conveyance of land entirely outside the boundaries of lot 4. Defendant in securing it obtained no land or right in which the plaintiffs had any interest. Their rights had long before been fixed.

I think the judgment should be affirmed.

CARPENTER, C. J., and HOOKER, J., concurred with GRANT, J.

BLAIR, J. I think the trial judge erred in directing a verdict for the defendant in this case regardless of the

question whether the original monuments fixed by the
original plat should control as to measurements or the
southeast corner of the Longyear-Buck building, as actu-
ally constructed in 1859.   I think it was a question for the
jury whether the south boundary of lot 4 had not been
fixed and established by the mutual agreement and acqui-
escence of the owners of lots 4 and 5 prior to the making of
the partition deeds between plaintiffs and defendant.   De-
fendant became the owner of the undivided one-half of
lot 4 in 1889, at which time Mr. Hinchey was the owner
of lot 5, adjoining upon the south.   At the time defend-
ant received his deed, lot 6 was occupied by Daniel W.
Buck and Louis Ehinger, and lot 5 was owned by James
W. Hinchey.   Mr. Buck, who was entitled to 44 feet of
land, actually had 44.14 feet; Mr. Ehinger, who was en-
titled to 22 feet, had 22.14; and Hinchey was entitled to
66 feet, which was the amount actually occupied by him
after the construction of the building next to lot 4.   This
building was constructed soon after defendant's purchase,
and according to his widow, who was subsequently mar-
ried, and testified as Mrs. Mary Hinchey-Bradley, some-
where near 1890.   This building was not completed by
Mr. Hinchey in his lifetime, but was finished by the
widow.   At the time of his death, the walls were up and
the building inclosed.   Since the death of Mr. Hinchey,
the widow, for herself and as guardian for the children,
conveyed the south 20.13 feet to one Gregor and the north
45.84 feet to Edward W. Sparrow.   This deed was exe-
cuted on the 6th of February, 1904, and contains a provis-
ion that the grant is:

"Subject to the rights of James J. Baird in the owner-
ship of the north half of the brick wall standing on the
north line of said land, the center line of said wall being
the dividing line between the lands above conveyed and
said Baird's land on the north."

The defendant Baird testified:

"I remember the circumstances of Mr. Hinchey's build-
ing south of lot 4.   It was understood that he was build-

ing his wall on lot 5—entirely on lot 5. He made a verbal arrangement, which was never put in writing, that the use of that wall could be got for a building on lot 4. He died before it was reduced to writing. The parties to that arrangement were Mr. Barnes, Mr. Hinchey and myself."

Either just before or immediately after the agreement for a partition had been made between the parties, Mr. Baird obtained a deed, dated June 1, 1903, from Mrs. Hinchey-Bradley, of the north six inches of the Hinchey wall, the description of the deed reading as follows:

"Commencing at a point on the west line of Washington avenue 131 feet and 6 inches north of the north line of Ionia street as now marked by the face of the south wall of Buck's furniture store, running thence west in center of wall 80 feet, thence north 6 inches, thence east on the north side of wall to Washington avenue, thence south 6 inches to place of beginning."

As to his procuring his deed, the defendant testified:

"The arrangement for our conveyance or our dividing the land had been made before and several days before. He had made a proposition and I had accepted it; but Mr. Scott, for some reason, either sick or didn't come down to execute the deeds, and I met Mr. Hammond and asked him if he was Mrs. Bradley's attorney, and told him about the arrangement *and when we ever got ready to build that we had right to join onto Mr. Hinchey's wall.* He said, 'Yes.' I asked him if he wouldn't give me a deed of Mrs. Hinchey and the heirs to that wall privilege. He said he would try and did get it."

Mrs. Hinchey-Bradley testified:

"*Q.* When you came into the ownership of this property, did you have any understanding or knowledge with reference to whether the north wall of the Hinchey building was a party wall or not?

"*A.* I always supposed it was. Yes, sir; understood it that way since it was built.

"*Q.* Did you understand that there was any record or paper writing of any kind confirmatory of or evidencing that fact?

"*A.* There was not."

This deed of June 1, 1903, contained the following recital:

"This deed is given to establish and confirm a party wall as now located on the lands described. If, in future, either of joint owners wishes to extend the wall to the west on same line and shall pay more than one-half of the total cost thereof, the owner not building shall before using such wall so extended pay to the other the one-half part of the total cost of it."

Mrs. Hinchey-Bradley received $10 as the consideration for the execution of this deed.

Upon defendant's theory, even after the making of this deed, he had no interest in the land immediately north of the wall but there was a strip of from 6 to 9 inches north of the wall which still belonged to the grantees of the Hinchey estate, and Mr. Baird testified that before he erected his building he got the consent of Mr. Sparrow, the owner of the adjoining building on lot 5, through a Mr. Church, to build up against that wall and that he had never received a deed of this strip between the wall and what he claims is the south line of his property; in fact, his counsel are driven to contend:

"He does not own or claim to own the land to the Hinchey wall. He built against it by the express consent of Mr. Sparrow. It is submitted that there is nothing in the record that would preclude the owner of the strip north of that wall from recovering the same and forcing defendant to erect the south wall of his building upon his own land."

I think that under these circumstances it was clearly a question for the jury whether an understanding had not been arrived at between the defendant and Mr. Hinchey at the time the wall was constructed; that it should stand as a boundary of their respective property and as a party wall subject to use and ownership of the adjoining owners, and that the deed of Mrs. Hinchey-Bradley was simply confirmatory of the oral understanding. This was manifestly Mrs. Hinchey-Bradley's understanding, and she completed the building upon that understanding, and

the credit to be given to the statement of the defendant, that he took this deed of the six inches of wall, knowing at the time that he could not make it available, and that he constructed his building and joined it onto the wall, knowing that the owner of this strip could compel him to remove it, and build a wall on his own land, as well as what the arrangement actually was, was for the jury.

Who was the owner of this strip, if not the owners of lot 4? Mrs. Hinchey did not claim to own it, as shown by her testimony and her deeds to Baird and Sparrow, but recognized Baird's ownership. The very terms of the deed to Baird indicate an understanding of the parties thereto that this wall divided their respective lands: " This deed is given to establish and confirm a *party wall*," etc.

" The term ' party wall ' is said to express a meaning rather popular than legal. It has been defined broadly as a wall between adjoining estates which is used for the common benefit of both, chiefly in supporting the timbers used in the construction of contiguous buildings on such estates. It has been said that, strictly speaking, a party wall is one built or supposed to have been built at joint expense and upon ground owned in common, so that each adjoining proprietor has an undivided interest in every part of the wall and in the ground on which it stands." 22 Am. & Eng. Enc. Law (2d Ed.), p. 237.

At the time Baird obtained his deed from Mrs. Hinchey-Bradley the partition deeds had not been executed, and he was simply the owner of an undivided one-half interest in the lot. The deed could not, therefore, operate as a conveyance to him by necessary implication of the nine-inch strip, as held by Mr. Justice GRANT, since he was not the sole owner of the adjacent lands, and might never be. It seems to me more consonant with reason and justice to hold that, Baird having represented, in substance, to his co-tenants that the Hinchey wall was the south boundary of the land which they were dividing, the deed obtained by him inured to their benefit.

Furthermore, I think that this case should have been

submitted to the jury to determine whether he was not estopped to deny that the walls standing at the north and south of this piece of land were party walls, and marked the north and south boundaries of the lot.   The testimony of Mr. O'Connor, one of the plaintiffs, was that when they were negotiating with reference to the partition deeds, he made Mr. Baird a proposition that he would take the south wall and pay him $75 or would give him the south half of the lot and take $75, on the ground that:

" The Barker wall is 90 feet long and only two stories high and the Hinchey wall is three stories high and 65 feet long.   Now the difference, in my judgment, is $75."

The plaintiff Scott testified:

"I don't know as I can give the precise language.   Mr. Baird called on us for the purpose of making a partition of the land, and he made an offer that if we would allow him to have the south half of lot 4 he would give us $75 for our interest in the Hinchey, the south wall of the third story.

" Q. Did he give you any reason why he would give that?

" A. He offered us $75 from the fact that the wall on the north side—the Barker and Parker wall on the north side—was only a two-story building.   We all agreed that being a two-story wall on the north, the Parker wall, and the wall that Mr. Baird was to take being the Hinchey wall, a three-story building, he offered us $75 for our interest in that wall."

Mr. Ernest D. Gibbs, an employé of plaintiff O'Connor, testified:

" It was suggested between Mr. Scott and Mr. O'Connor on the one side and Mr. Baird on the other, that it was immaterial which had the north half of the lot.   Mr. Baird wanted the south half, and proposed that he take the south half of the lot because of the fact that the wall of the south half was a three-story wall and the wall of the north half a two-story wall, and Mr. Baird agreed with Mr. O'Connor and Mr. Scott to pay $75 additional for the additional benefit of the extra story on the south part of the lot."

Plaintiffs offered to show by the receiver who sold the undivided one-half interest in the property to plaintiffs that the receiver stated to persons present at the sale, among whom was the defendant Baird, who heard what he said, that:

"The property he had for sale was the property between those walls, and that they would have to build no walls excepting a cross-wall for that west wall. There was a wall for use on the south side and a wall for the use on the north side."

This evidence was rejected by the court and should, in my opinion, have been received. These facts were disputed by defendant, but if the jury found that they were true, as stated by plaintiffs, they would have justified and required a verdict in favor of the plaintiffs. *Cleveland-Cliffs Iron Co.* v. *Gauthier*, 143 Mich. 296; *Jones* v. *Pashby*, 62 Mich. 614; *Dickerson* v. *Colgrove*, 100 U. S. 578.

I do not regard the deed between the owners of lots 3 and 4 as in any wise invalidating the above conclusions. The question here is as to the south boundary line. That deed, reciting a consideration of $1, conveys as follows:

"All that certain piece or parcel of land situate and being in the city of Lansing, county of Ingham, State of Michigan, known and described as follows, to wit: The undivided one-half interest in and to a strip of land described as follows, to wit: The north 15 inches of lot 4, block 83, City of Lansing, Mich., except west 8 feet, which has heretofore been deeded to the city of Lansing for alley purposes. This deed is given to establish the wall line between the lands of the parties hereto, and particularly the south wall of the brick block known as the 'Barker and Parker Block,' occupying the east 90 feet of the above-described premises, and to vest in each of the parties hereto, their heirs and assigns, the said wall and land, it being expressly covenanted and agreed by the parties hereto for themselves, their heirs and assigns, that if the wall now on the land above described, or any wall hereafter ever erected thereon shall be destroyed, either of the owners in common of said land, may there-

after make use of the said wall as a party wall only by paying the builder, his heirs or assigns, one-half the value of said wall at the time of beginning such use, such value to be the cost of such a wall at the time of such use. It is understood and agreed that the parties of the first part, from and after the execution of this deed, are the owners of an undivided one-half of the wall now upon the land in the deed described, and entitled to the use thereof."

Whether the Barker wall stood entirely upon lot 4, or the deed was made out of abundant caution to establish it as a party wall, whether on lot 3 or lot 4, the result of the deed was to establish a north boundary and party wall for lot 4. The deed did not change the amount of land between the two walls nor necessarily disprove the claims of the owners of lot 4 to the Hinchey wall as the south boundary or party wall. This deed and plaintiffs' knowledge of it were proper for the consideration of the jury along with the other facts and circumstances, but they do not dispose of the case. The only person who claims that the Hinchey wall was not the south boundary of lot 4 is the defendant Baird, and I think it was for the jury to say whether he made that claim in good faith. If the testimony in behalf of plaintiffs is true, they were told by the receiver, in the presence of defendant, that the land they were buying a half interest in was bounded on the south by the Hinchey wall. But it is said that defendant's land was not being sold, and he was under no obligations to speak. It would be more correct to say that defendant's interest was not being sold. The interest which was being sold affected every particle of the land within the four boundary lines, and the boundaries of defendant's land would be the boundaries of plaintiffs' land. But it is not claimed that this silence, of itself, estopped defendant.

In my opinion, it was, however, competent as notice to defendant that the purchasers understood that they were buying, and the receiver understood that he was selling, a half interest in the land between the walls, and as characterizing defendant's later representations, and in con-

nection therewith explaining and defining the meaning of the word "half" in the partition deeds. See *Jones* v. *Pashby*, supra. Later on, when the parties were negotiating for a division of the land, defendant, as we must assume, knowing the understanding the plaintiffs had of the boundaries of the land, distinctly encouraged that understanding, and, in effect, assured them of its correctness. The parties dealt upon the express and declared understanding that the line dividing the north and south halves of the lot was midway between the two walls. Accepting the plaintiffs' proofs as true, the jury would be warranted in finding that the plaintiffs intended to convey to defendant, and that he represented to them that he intended to convey, one-half of the land between the walls. It is not consistent with my sense of justice, nor with my interpretation of the law, to permit the defendant, having induced the plaintiffs to act upon his representations, to deny the truth of his representations and claim, as he did after he had obtained the plaintiffs' deed, that the Hinchey wall was not the south boundary and his half of the land was larger than theirs. "He says to me, I understand you claim more land down there than we have got. I said I certainly did."

I think the judgment should be reversed, and a new trial granted.

McALVAY, MONTGOMERY, and MOORE, JJ., concurred with BLAIR, J.

OSTRANDER, J., did not sit.