## WOODBURY *v.* VENIA.[1]

1. SURVEYS—BOUNDARIES—HOW DETERMINED.
   A boundary line between adjoining proprietors, unless fixed by agreement, acquiescence, or adverse possession, is to be determined in accordance with the original government survey.

2. SAME—MONUMENTS AND MEASUREMENTS.
   The rule that monuments control courses and distances, and that, when monuments and measurements vary, the monuments always control, applies only to monuments and measurements made by the original survey.

3. SAME—HIGHWAYS AND FENCES—EVIDENCE.
   Therefore, an old fence or a highway, supposed to be upon the boundary line between two sections, but not shown to have been erected or laid out with any reference to the original survey, is not better evidence of the actual location of a disputed section corner than surveys made from the government field notes by subsequent surveyors.

4. SAME—WITNESSES.
   Where a surveyor had testified in an action of trespass that he had located a disputed section corner at a given point by reference to the field notes of the government survey, and that he had discovered there traces of the stake driven by the government surveyor to mark the place, it was not a material inquiry whether existing fences would have to be changed under his survey.

Error to Monroe; Kinne, J. Submitted June 10, 1897. Decided September 14, 1897.

Trespass *quare clausum fregit* by Rosina Woodbury against Godfrey Venia. From a judgment for plaintiff, defendant brings error. Affirmed.

*John O. Zabel,* for appellant.

*Watts, Bean & Smith,* for appellee.

[1] Rehearing denied November 23, 1897.

LONG, C. J. This is an action of trespass commenced in justice's court. Defendant pleaded title. The cause was removed to the circuit court for trial before a jury, and the plaintiff had verdict and judgment.

The plaintiff was the owner, and in possession, of the north 10 acres of the south 26 acres of the W. ½ of the E. ½ of the N. W. fractional ¼ of section 3, township of Whiteford, Monroe county. On the trial she testified that the defendant owned the land south and east of her land, and that in the month of April, 1895, he drew a line across her land, and proposed moving the fence over to that line. This she forbade, but he removed the fence over upon her land on the south and east four or five rods. On cross-examination she testified that the fence at that time was on what was known as the "Winney" line; that defendant claimed that this was not the true line, but that what was known as the "Baldwin" line was the true line; and that he moved the fence over to the Baldwin line. It appears that the plaintiff had moved the fence to the Winney line some two years before, and the defendant, at the time of the claimed trespass, moved it back to the Baldwin line; so that the whole controversy arises over the true location of the lines on the south and east sides of this 10 acres.

It is admitted upon both sides that these lines are subdivisions of the north half of section 3, and that their correct location depends upon the correct location of the northeast corner of section 3. Two or more surveys have been made to determine the correct lines of this 10 acres. A surveyor by the name of Baldwin had run the lines for the defendant, and Mr. Winney had surveyed the lines for the plaintiff. Other parties and some surveyors were present at the time these lines were run out, and they were all witnesses in the case.

Surveyor Baldwin, being called as a witness for the defendant, testified that in the fall and winter of 1890 he made a survey of the north half of section 3 in that township. He says:

"We commenced from the quarter post on the east side of the section, ran west to the quarter post on the west side. At each of these places there were stones. The original witness trees were not there; in fact, I did not find any on the corners in the north half of the section. I then ran north, to the northwest corner of the section, where we found a stone. Then we ran east, to the northeast corner of section 3, where we found a stone, which, after considerable measuring and examination, I accepted as correct. The difficulty in the section was in the northeast corner. * * *.

"*Q.* What led you to accept the stone which you found at the northeast corner of section 3 as correct?

"*A.* I saw there was some trouble there, because the highway supposed to be on the section line running north and south in Summerfield, the jog between this highway and the one in Whiteford, did not agree with the government notes, and the difficulty was to determine which of those was correct, or, if I could, what made the difference. There were no witness trees ever taken by the government surveyor to the northeast corner of section 3. The notes of the government survey give witness trees to the southeast corner of section 34 in Summerfield,—that was supposed to be the corner where the Summerfield road was,—and noted a jog in the corners of something like 24 or 25 rods; and the actual jog, as the roads are built, was, I think, four or five rods. I do not know the exact distance; did not agree with the notes at all. I then made inquiry as to the length of time this stone which we found in the road had been there. I also inquired as to how long the west part of section 2 had been fenced, and how long the road had been fenced as it was there. The fences on the west side of the section were very old. They showed they had been there a good many years, and the parties there present at the survey said they had been."

The witness further stated that, after some further inquiries of parties present, and finding that, if he took the corner of section 34 as correct, it would move all the fences on section 2, where they had been built for some 15 or 20 years, as well as the division fences in section 3, where they had been built for about the same length of time, he "then went on and completed this survey, with this corner of section 3 as the correct corner, * * * and

divided the north half of this section correctly, with this stone as the northeast corner of the section." The witness stated that this stone was in the center of the north and south road as then laid out.

The government field notes were also offered in evidence. These notes called for witness trees at the southeast corner of section 34 of Summerfield, as follows: "White oak, 12 inches in diameter, south, 53 degrees west, 2 1-100 chains; elm, 12 inches in diameter, south, 49 degrees west, 2 9-100 chains."

Mr. Winney was called as a witness by the plaintiff, and testified that he had done surveying for 50 years, and surveyed this section in Whiteford in 1893. He stated:

"I ascertained the northeast corner of section 3 from the bearings cited for the southeast corner of section 34 in Summerfield, and quarter post south of section 35. I ascertained the southeast corner of section 34 from the U. S. witness tree, bearing tree. I found the elm tree. These trees were necessary to locate the northeast corner of section 3, because the corner of section 3 had no bearing or witness trees. None were given in the notes. That would indicate that the corner was in a prairie. The notes say: 'A prairie. No bearing trees. 6 14-100 chains east of southeast corner of section 34, set post at intersection of corners 2 and 3 in prairie. No bearing trees. Soil, timber, and undergrowth as last noted.' After I found the southeast corner of section 34, I located the northeast corner of section 3 by measuring east 6 14-100 chains. I ran out section 3 with this point as the northeast corner of section 3, and subdivided the lands."

Another surveyor, by the name of Richards, was also present with Mr. Winney when this survey was made, and testified to the same facts as testified to by Mr. Winney. Mr. Henry F. Bean, witness for plaintiff, a surveyor and civil engineer, was present with Winney, and testified to the same facts. They all testified to finding the elm tree, and recognized it as the witness tree to the corner of section 34. From other testimony it appears that the oak, the other witness tree, was gone, but they claim to have found the remains of it by digging. They also claim to

have found evidences of the original stake set by the
United States surveyors at the corner of section 34.
Taking their measurements from the witness trees, they
dug down, finding a black spot in the earth.   Following
this downward, the hole or black spot tapered, growing
smaller, like a stake driven down.   At the bottom
they found a little rotten wood, and this was taken by
Mr. Winney as the corner post of section 34.   Measuring
from this point, and following the direction of the field
notes of the government survey eastward 6 14-100 chains,
they rested, and again dug, and claim to have found the
traces of the point of a stake marking the northeast corner
of section 3.   They measured from this point to the quar-
ter post east and the quarter post west, and claim to have
found them all right.   The point where they claim to
have located the southeast corner of section 34 was shown
to be exactly in the center of the east and west road and
the road running north into Summerfield.

There was no evidence in the case showing, or tending
to show, that the boundary line between the plaintiff and
the defendant had ever been fixed by agreement between
the parties, by acquiescence, or adverse possession.   The
court thereupon directed the jury that there was but one
question in the case, and that was which was the correct
survey,—that made by Mr. Baldwin or that made by Mr.
Winney; that, if they found the survey made by Mr.
Baldwin was correct, their verdict must be for the defend-
ant; while, on the other hand, if they found the Winney
survey correct, their verdict would be for the plaintiff.

The defendant asked the court to instruct the jury, by
the second request to charge, as follows:

"It appears from the testimony in this case that the
cause of variation in the surveys of the premises in dispute
as run by Winney and Baldwin is in the different location
of the northeast corner of section 3.   It also appears from
the testimony that there were never any witness trees
to this corner.   It is therefore for the jury to determine
whether the stone found by Mr. Baldwin is the correct
location of this corner, or whether the corner set by Mr.
Winney, about 20 rods farther east, is correct."

This was given by the court.

The defendant further asked the court to charge:

"A long-established road is better evidence of actual boundary, settled by practical location, than any survey made after the monuments of the original survey have disappeared."

Also the court was asked by the defendant to instruct the jury:

"It is for the jury to determine from the testimony whether such evidence as is before them of the location of the corners between sections 34 and 35, in connection with the testimony in this case, is of more value in determining the northeast corner of section 3 than the road claimed by the defendant to have been upon the east line of the north half of said section 3 for 15 years and upwards. If the jury are satisfied that the long-continued use of this road in its present location, as claimed by the defendant, is the best evidence, to their minds, of the location of the east line of the north half of section 3, then the jury would be justified in finding that Mr. Baldwin is correct in his location of the northeast corner."

These requests were refused.

It is not contended by counsel for plaintiff but that, as an abstract proposition, counsel was right in claiming that this road would be better evidence of the location of the northeast corner of section 3 than the survey made by Mr. Winney, if it had been shown that this road had been laid out upon the section line at the north end; but counsel claim there is absolutely no evidence in the case that the road was placed upon the section line.

In this we think counsel are correct. It is not pretended by Baldwin that he knew that this road was located upon the section line. Mr. Montri testified that he was chain man when Baldwin made his survey; that, when they came to the north end of the road as now located, Mr. Baldwin said: "This is not the section line. The section line is over yonder; it is farther east. The road is wrong, but I have no right to move it." And witnesses Lockwood and McMicken both testified that this road was not

laid on the section line, and McMicken testified that the road was finally opened in the edge of the timber, while the field notes show that the northeast corner of section 3 was in the prairie. ˙ We think, under these circumstances, the court was not in error in refusing to give these requests, and that it would have been error to charge that the location of this highway was the best evidence of this corner.

Counsel for defendant has cited numerous cases laying down the rule that monuments control courses and distances, and that, if the original landmarks are no longér discoverable, the question is, where were they located? and that upon that question the best possible evidence is usually to be found in the practical location of the lines, made at a time when the original lines were presumably in existence, and that, as between old boundary fences and any survey made after the monuments have disappeared, the fences are by far the better evidence of what the lines of a lot actually are. It is not contended by counsel for plaintiff but that these rules are well settled in this State, but it is contended that subsequent surveyors cannot make monuments of their own, which shall control the government surveyor's measurements, and that the original government survey must always control, and the effort should be to find, if possible, where the lines are on the ground; that the original survey must control, although it may have been incorrect at the time it was made.

It is a well-settled law in this State that monuments control courses and distances, and that, when monuments and measurements vary, the monuments always control; but this reference is to monuments and measurements made by the original survey. Courses and distances would not be controlled by monuments made by some person unauthorized to make them; and the whole trouble with defendant's contention is that he was unable to locate the northeast corner of section 3, unable to show that the north and south highway was on the section line

between 2 and 3, or that these division fences upon section 3 were located with reference to any measurements from the true northeast corner of section 3. He found a stone at that corner, but there is no showing that it was one of the original monuments marking the corner. On the other hand, the testimony of the plaintiff's surveyor is that he was able to find and locate upon the ground the southeast corner of section 34, and that, in accordance with the original survey, and following the field notes with courses and distances eastward 6·14-100 chains, he discovered evidences of an old stake in the ground, and located that as the northeast corner of section 3. There was no evidence in this case of any monuments shown by the defendant which the court was bound to instruct the jury would be better evidence of the actual location of the northeast corner of section 3 than the surveys and measurements made by the plaintiff's surveyors.

It is contended that the court was in error in not permitting Mr. Winney, on cross-examination, to state whether or not the division lines on section 2, as well as the lines on section 3, according to their present location, would have to be changed under his survey. We think this was wholly immaterial. The question had reference to fences already built there. If Mr. Winney and the other surveyors with him found the original corner as established by the United States survey of section 34, and then followed the field notes which located the northeast corner of section 3, it would necessarily fix and determine that corner of section 3, and Winney and the other surveyors claim that they found evidences of the old stake there. If the jury found that Winney was stating the truth about it, then the northeast corner of section 3 was plainly established, and there was nothing in the testimony of Mr. Baldwin which in any manner contradicted it. According to Baldwin's own testimony, he had no starting point to commence a survey which had been definitely fixed by the original survey, and he simply assumed that the northeast corner of section 3 was where he found this

stone, without any evidence to show that the stone actually marked the correct corner.

It is further contended that the court was in error in his charge to the jury, as follows:

"From the evidence submitted to you, from these men and other men, of the facts and circumstances as they have been developed, all these matters you should take into consideration, and from them determine where the true government survey is, or ought to have been."

We think there was no error in this, when taken in connection with the other parts of the charge. Counsel, in his criticism of the judge, says:

"While in other portions of his charge he submits the whole question to the jury, without consideration of the evidence, yet this constant reiteration that the jury should find where the correct line ought to be, or should be, according to the government survey, could not do otherwise than leave the jury to believe that the proper survey was the one which made the jog at the northeast corner of section 3 conform to the jog mentioned in the government field notes."

There was no error in the court saying to the jury that they must find where the correct line ought to be, or should be, according to the government survey. That was the very inquiry of the case. Where did the government survey locate upon the ground the northeast corner of section 3? If that question were properly solved, it determined the rights between these parties, and the jury were told plainly that this was the issue. Personally, I am satisfied that it would not have been error if the court had directed the jury that the plaintiff's testimony tended to fix that corner in accordance with the government survey, and that there was no testimony on the part of the defendant to contradict it.

The judgment must be affirmed.

GRANT, MONTGOMERY, and MOORE, JJ., concurred. HOOKER, J., did not sit.