POCH  v.  URLAUB.

1. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.
   The Supreme Court will view the facts in the light most favorable
   to plaintiff on his appeal from direction of a verdict for de-
   fendant.

2. BOUNDARIES—SURVEYORS—STARTING   POINTS—VESTED   RIGHTS—
   ENCROACHMENT.
   Surveyors have no greater right than other persons to determine
   starting-points and boundaries and cannot disturb ' vested
   rights in land or settle controversies as to titles and their
   *ex parte* action is entitled to no special authority in regard
   to true lines and the fact of encroachment.

3. WATERS AND WATERCOURSES—OWNERSHIP AND DIVISION OF WATER
   RIGHTS.
   .Whatever water rights belong to any part of a subdivision of
   land must necessarily fall within those that belonged : to the
   whole of it at the time when it was made ready for sale by
   the United States government, and no change, if any took
   place, in the shore line could enlarge that grant at the expense
   of any other, it being the right of the owner of water rights
   within the subdivision to determine for himself in what way
   he would subdivide and parcel out his own property.

4. BOUNDARIES—SURVEYORS.
   A surveyor cannot fix private rights or lines by any theory of
   his own.

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error § 886.
[2, 4] 8 Am Jur, Boundaries § 99.
[3] 56 Am Jur, Waters § 275.
[5, 8, 11, 12] 8 Am Jur, Boundaries § 101.
[6, 7] 8 Am Jur, Boundaries § 33.
[9, 10] 8 Am Jur, Boundaries §§ 62, 63.
[13] 42 Am Jur, Public Lands § 40.

5. SAME—ORIGINAL GOVERNMENT SURVEY.

>A boundary line between adjoining proprietors, unless fixed by agreement, acquiescence, or adverse possession, is to be determined in accordance with the original government survey.

6. SAME—SUBDIVISION OF FRACTIONAL SECTIONS—LINE FIXED AT ONE END.

>The subdivision of fractional sections in a fractional township, where the division line has but one end fixed and certain, is accomplished under a special statutory provision that the line shall run due north, south, east or west, as the case may be, to the watercourse, Indian boundary line, or other external boundary (43 USCA, § 725).

7. SAME—FRACTIONAL LOTS—WATER FRONTAGE—AREA.

>Fractional lots in a United States government survey are those irregular tracts of land designated on the plats of surveys by the land department of the government, not by the surveyors, and are so arranged as to be the most convenient and equitable form for both the purchaser and the government, dividing a shore line along a navigable stream or lake so as to give as many lots with a substantial water frontage as the situation will permit on the theory that water-front lots are more valuable than an equal area of land not touched by water.

8. SAME—GOVERNMENT SURVEY.

>The location of a boundary line appearing on an official plat of the United States government survey, approved by the surveyor general, is controlling when government lands have been disposed of in conformity to such line.

9. SAME—NATURAL MONUMENTS—DISTANCE—QUANTITY.

>Generally, where the original survey and government plat of a tract of land appears to have as its boundary a body of water, such body of water is a natural monument, and will constitute the boundary, however distant or variant from the position indicated for it by the meander line, and hence will control as a call of the survey over either distances or quantity of land designated in the conveyance or on the government plat.

10. SAME—NATURAL MONUMENTS—COURSES AND DISTANCES.

>The lines of a United States government patent of lands must substantially conform to natural objects called for therein at the expense of courses and distances, and distances may be shortened or lengthened in order to conform the location of the patent to and with the natural objects called for.

11. SAME—GOVERNMENT SURVEY LINES—WATER FRONTAGE.
    United States government survey lines are controlling as between
    parties claiming water frontage land along arm of lake in the
    absence of private agreements altering the boundaries, where
    the lake appears as a natural object in the patents of the
    land as lots.

12. SAME—GOVERNMENT SURVEY—DISTANCES—QUANTITY.
    Definite and permanent monuments in a United States govern-
    ment survey are to control distance and quantity.

13. PUBLIC LANDS—GOVERNMENT SURVEY—COLLATERAL ATTACK.
    A plat of United States government survey, together with the
    field-notes, lines, descriptions and land-marks, are as much a
    part of the grant as if the descriptive features were written
    in the deed or grant and not open to challenge by any collateral
    attack in the courts.

Appeal from Presque Isle; Glennie (Philip J.), J. Submitted June 4, 1959. (Docket No. 36, Calendar No. 47,874.) Decided October 12, 1959.

Ejectment by Lyman Poch, Dorothy Poch, Guy Flegal, Reba Flegal and Luella Brown against LeRoy Urlaub, Florence Urlaub, Gustav Grulke, Lena Grulke, Elmer Claus and Grace Claus to recover possession of lands bordering on lake. Cause dismissed on motion made at conclusion of plaintiffs' proofs and taken under advisement pending completion of testimony. Plaintiffs appeal. Reversed and remanded.

*Louis G. Jarboe,* for plaintiffs.

*Elmer L. Radka,* for defendants.

KAVANAGH, J. This is an action in ejectment, plaintiffs claiming that defendants wrongfully are in possession of certain lands owned in fee by plaintiffs abutting on the south shore of an arm of Lake Nettie located in section 32, Bismarck township, Presque Isle county, Michigan.

Originally plaintiffs filed a bill to remove cloud from title and for an injunction restraining defendants from interfering with plaintiffs' possession.

Defendants made a motion to dismiss and the court held, in a written opinion, that plaintiffs had an adequate remedy at law. Upon motion of plaintiffs, the cause was transferred to the law side, and proceedings were stayed pending trial of the issue.

After pleadings were filed and the matter was at issue, a stipulation was entered into in open court that plaintiffs claimed title by record title and not by adverse possession.

Plaintiffs claimed to be owners in fee of the following parcels: Guy Flegal and Reba Flegal, the east 70 feet of the west 1250 feet of government lot 4, section 32, town 34 north, range 4 east, north of the Ocqueoc river. Luella Brown, the east 50 feet of the west 1200 feet of government lot 4, section 32, town 34 north, range 4 east, north of the Ocqueoc river. Lyman Poch and Dorothy Poch, the east 50 feet of government lot 4, section 32, town 34 north, range 4 east. Plaintiffs acquired title thereto during the years 1937 to 1943.

Defendants, by virtue of a conveyance dated July 1, 1953, claim ownership in fee of lands abutting on the south shore of the arm of Lake Nettie in said section, town and range, purporting to be in government lot 3, and described as:

"Beginning at a point 83.1 feet due north and 67.6 feet due west of the center corner of the southwest quarter of section 32, town 34 north, range 4 east, thence running north 38 degrees 53 minutes west 216 feet to the shore of Lake Nettie; thence north 72 degrees 02 minutes east along the lake shore 73.5 feet; thence south 22 degrees 49 minutes east 208 feet; thence north 86 degrees 28 minutes west 15 feet to the point of beginning, being a part of lot 3, said section."

Also:

"Beginning at a point 82.1 feet due north and 52.6 feet due west of the center corner of the southwest quarter of section 32, town 34 north, range 4 east, thence running north 22 degrees 49 minutes west 208 feet to the shore of Lake Nettie; thence south 80 degrees 40 minutes east along the lake shore 72.9 feet; thence south 10 degrees 48 minutes east 185.0 feet; thence north 86 degrees 28 minutes west 26 feet to the point of beginning, being a part of lot 3, said section."

Defendants' title and right of possession depend upon the validity and legality of an amended boundary line between said government lots 3 and 4 established in 1948 by a private surveyor, namely, G. T. DeLaMater. This line runs from the east boundary line of lot 4 extending north in a straight line from the southeast corner of the lot to a point where it would intersect the south line of lot 3, as such line is located on maps prepared from private surveys, and from there to run north 38 degrees 53 minutes west to the actual waters' edge. The above descriptions of land first appeared as such in the records of Presque Isle county on May 20, 1948.

A reference to the following plat should aid in understanding the questions at issue:

ENLARGED MAP OF ORIGINAL GOVERN-
MENT SURVEY OF SECTIONS 29, 30, 31
and 32, town 34 north, range 4 east.

The south line of lot 3 as shown on recent
surveys is indicated by a broken line.

The solid line is the government survey.

The plat is a part of plaintiffs' exhibit 2, which was admitted in evidence as a true copy of the survey of township 34 north, range 4 east.

A reference to a copy of the official government plat shows section 32 to be fractional, made so by an inland lake, with an arm of the lake extending easterly into what would ordinarily be the southwest quarter of the said section.

Lot 4, in which the plaintiffs claim the disputed lands are located, is shown in the southwest corner of the section bounded on the south and west by the section lines, on the entire north by the lake, and by an indicated interior line running north perpendicular from its south boundary in a straight line until it runs into the lake to form its east boundary line.

Lot 3, in which the defendants claim the lands in dispute are located, is shown to be bounded on the entire west by the lake, on the north and east by indicated quarter lines and by an indicated interior line running west perpendicular from its east boundary in a straight line until it runs into the lake at the mouth of the outlet to form its south boundary line. No part of lot 3 is shown to include any lands on the south shore of the arm of the lake.

Plaintiffs introduced in evidence the original deeds to them containing the descriptions as above set forth. They introduced in evidence exhibit 2, above referred to, and the survey plat of township 34 north, range 4 east, indicating that it was surveyed by the United States government surveyors as to township lines in the second quarter of 1840, as to subdivisions in the second quarter of 1856, and certified by the surveyor general's office under date of December 6, 1856, as being strictly conformable to the field notes of the survey thereof on file in the surveyor general's office. Plaintiffs introduced in evidence abstracts of title certified from the United States government to

substantially the date of trial, showing a United States patent issued to Luther C. Pratt, dated March 10, 1874, recorded February 5, 1907, in liber 31 of deeds on page 325, covering lot 4, section 32, town 34 north, range 4 east. The abstracts show the transfers of title by mesne conveyances from Luther C. Pratt to the respective plaintiffs.

Plaintiffs' exhibit 1, received in evidence, is a true copy of the United States government field notes pertaining to this section 32, town 34 north, range 4 east, including references to all witnesses, monuments, distances, and courses, including waters of Lake Nettie.

Plaintiffs testified that upon receiving conveyance of their property they went into immediate possession of the same and have continued in that possession until dispossessed by the defendants.

Mr. Dean DeLaMater, a registered land surveyor in Michigan, in reply to a question by defendants' counsel, outlined generally what was done with reference to original surveys:

"*A.* I will try to be as brief as possible. Specifically, Michigan in the "thirties," after it became a State, by order of the surveyor general, was ordered to be surveyed into townships and sections. And deputy surveyors were sent out throughout the State, and they surveyed this particular township in the second quarter as is contained here, in 1840, with directions to run a 6-mile square township as near as possible, and conforming to the correction that might be on either side of it, above or below it. With every mile setting a section corner, so-called, and witnessing it with adjacent trees. And every half-mile, setting a quarter section post; witnessing that with any adjacent trees or rocks, or whatever might be near there, and in running the survey lines to take notice of any rock out-crop. In other words, to get a picture of the line as they cross; and to set stakes every half-mile of boundary of your township.

"And then at a later date, and in this case, 16 years later, Mr. Alfred Millard, a deputy surveyor, was sent in to subdivide the township; divide it into 36 sections. And again, he was instructed to run these section lines at half-mile intervals; to set the quarter section corner, and at every mile to set a section corner.

"I am skipping over some of the methods we had to use. But basically, they arrived at 36 sections, containing, they hoped, 640 acres. And wherever they encountered lakes they set on the bank of the lake, on the section line, what we call a meander post. They then meandered or mapped the lake, take notes and drawing them on their plats. Winding up with a map of a township containing 36 sections; of all lakes and streams, of all the swamps, all of the pine forests; because actually they were making the original survey."

Private survey was made beginning in October, 1945. This survey was finished some time early in 1946 by the father of registered surveyor Dean DeLaMater and locates the south line of lot 3 approximately 300 feet south from that shown on the government plat. The survey indicates that it would intersect the east line of lot 4 at a point in excess of 200 feet south of the lake, rather than in the waters, if extended, as shown on the government plat; and that the southeast quarter of the southwest quarter does not abut on the lake as shown on the government plat.

Private surveys also show the meander line of the lake, according to the official copy of the field notes as run by the original government survey, to be north of the intersection of the east line of lot 4, and the south line of lot 3, as such line is located on maps prepared from the latest surveys at a distance of approximately 300 feet south from that shown on the government plat.

Plaintiffs claim that the legal east boundary line of lot 4 is shown on the government plat, extending north in a straight line from the south boundary to the actual waters' edge. Defendants claim the east boundary line of lot 4 extends north in a straight line from the southeast corner of the lot to a point where it would intersect the south line of lot 3, as such line is located on maps prepared from private surveys, and from there to run north 38 degrees 53 minutes west to the actual waters' edge. Defendants claim to own the disputed portion by reason of conveyance from the owners of lot 3.

The sole question in the case was: Does the east boundary line of lot 4 extend to the waters' edge? If so, plaintiffs own the disputed property and are entitled to a judgment of possession.

At the conclusion of plaintiffs' proofs, defendants made a motion to dismiss. This motion was reserved by the court. Defendants entered their proofs. The motion to dismiss by defendants was made on the grounds of CL 1948, § 629.8 (Stat Ann § 27.1921), which, defendants' counsel argued, sets forth that before an ejectment action can prevail it is necessary that the property be sufficiently described and be sufficiently definite so that possession can be given by the court. He further contended that there was no evidence to indicate the lines of plaintiffs' property, and nothing specific was introduced to clearly lay down the property involved so the court could find what property plaintiffs owned, particularly since 2 of the descriptions of the plaintiffs' property indicate there possibly was a 20-foot overlap.

The trial court, almost 2 years after the trial was concluded, found that:

"There appears to be nothing else in support of plaintiffs' case other than general allegations of ownership and specific descriptions which are located

somewhere within the confines of government lot 4.
* * *

"It is obvious from the case made by plaintiffs on the limited proofs offered that it leaves this court in such a state that it cannot say that the plaintiffs have established their title so as to determine the real issue presented. The court finds itself in a position where the motion for the directed verdict must be granted."

Plaintiffs appeal and claim (1) that they had established sufficient record title to make a prima facie case in ejectment; (2) that although the court didn't determine what is the legal east boundary line of government lot 4, section 32, town 34 north, range 4 east, Bismarck township, Presque Isle county, Michigan, as a matter of law it is actually a straight line from a point on the south section line, midway between the southwest corner and the south quarter corner of the section, north to the actual waters' edge of Lake Nettie.

It is difficult to imagine how the trial court could expect plaintiffs to introduce in evidence any more proof of their ownership of this property. They introduced their recorded deeds; they introduced abstracts of title showing the original patent and mesne conveyances from the government to the plaintiffs; they introduced the original survey plat; they introduced the original survey notes; they produced evidence that they had taken possession and maintained possession of this property for a number of years prior to their dispossession by defendants.

If, as a matter of law, the east boundary line of lot 4 is as claimed by plaintiffs, they have established a prima facie case.

It has been stated so often by this Court as to not require citation of authority that on appeal by plaintiff from direction of a verdict for defendant, the

Supreme Court will view the facts in the light most favorable to plaintiff.

In *Diehl* v. *Zanger*, 39 Mich 601, 605, Justice Cooley said:

"Nothing is better understood than that few of our early plats will stand the test of a careful and accurate survey without disclosing errors. This is as true of the government surveys as of any others, and if all the lines were now subject to correction on new surveys, the confusion of lines and titles that would follow would cause consternation in many communities. Indeed the mischiefs that must follow would be simply incalculable, and the visitation of the surveyor might well be set down as a great public calamity."

In *Gregory* v. *Knight*, 50 Mich 61, it was stated:

"Surveyors and commissioners of highways have no greater right than other persons to determine starting-points and boundaries; they cannot disturb vested rights in land or settle controversies as to titles and their *ex parte* action is entitled to no special authority in regard to true lines and the fact of encroachment." (Syllabus.)

In *O'Brien* v. *Cavanaugh,* 61 Mich 368, 370, the Court said:

"There was no testimony of any other right, except that of a surveyor, who undertook to change the line as the result of an *ex parte* survey, based on certain starting points, which threw out of place all the lots in the neighborhood.

"We agree with the judge below that this survey could not lawfully be regarded. A surveyor has no more right than any one else to decide upon starting points and other elements of location. We have had frequent occasion to refer to the mischief done by the officious meddling of such persons under some notion that it is within their province to unsettle possessions and landmarks."

In *Fisher* v. *Dowling*, 66 Mich 370, 371, 372, again the Court said:

"We have had frequent occasion to condemn the assumptions of surveyors in determining lines and landmarks according to their own notions. They have no such right, and their assumptions are not lawful. There are few evils more annoying to public or private peace than the intermeddling with land boundaries, and the disturbance of peaceable possessions."

In *Jones* v. *Lee*, 77 Mich 35, 41, the Court said:

"Whatever water-rights belong to any part of that subdivision must necessarily fall within those that belonged to the whole of it at the time when it was made ready for sale by the United States government, and no change, if any took place, in the shore line could enlarge that grant at the expense of any other. *It is also beyond question that any owner of water-rights within that subdivision could determine for himself in what way he would subdivide and parcel out his own property.*" (Emphasis supplied.)

And further, after commentation (p 42) on the surveyor's assumed technical knowledge of the right method of division, the Court said (p 43):

"We have had occasion, in several instances, to point out that a surveyor cannot be allowed, under any circumstances, to fix private rights or lines by any theory of his own."

Clark in his work, On Surveying & Boundaries (2d ed), § 54, p 53, states:

"It has been held that where the official plat and approved survey located premises in the northeast quarter of a section and the patent under which plaintiff claimed the land, described it as the southeast quarter of the section 'according to the official plat of the survey returned to the general land-office by the surveyor-general,' neither parol evidence nor

a private survey could be shown to establish that the premises were located in the southeast quarter of the section."

In *Woodbury* v. *Venia,* 114 Mich 251, it was said:

"A boundary line between adjoining proprietors, unless fixed by agreement, acquiescence, or adverse possession, is to be determined in accordance with the original government survey." (Syllabus 1.)

In Clark, On Surveying & Boundaries (2d ed), § 136, p 125, are found the following excerpts:

"The subdivision of fractional sections in a fractional township, where the division line has but one end fixed and certain, is accomplished under a special provision of the statutes.* This rule provides that the division line shall run due north, south, east or west, as the case may be, to the watercourse, Indian boundary line, or other external boundary."

Section 144, p 131:

"Surveyors and members of the bar are not always familiar with the method pursued by the government in parting off and numbering the lots in fractional sections. That a set of uniform rules has been laid down for the guidance of the government officials whose duty it is to part off and number such lots does not seem to have been much considered by local surveyors."

Section 145, p 133:

"Fractional lots are those irregular tracts of land designated on the plats of surveys by the land department of the government."

Section 146, p 133:

"The subdivision of the various fractional sections * * * is performed by the draftsmen in the office to which reports and notes are sent, and not by the

---

* See 43 USCA, § 752.—REPORTER.

surveyor who did the field work. In so subdividing, forming, and numbering the lots, the officials are required to use their best skill and judgment to 'arrange the lots in the most convenient and equitable form for both the purchaser and the government.' The idea is to divide the shore-line along a navigable stream or lake so as to give as many lots with a substantial water-frontage as the situation will admit. This is on the theory that water-frontage is generally regarded as more valuable than an equal area of land not touched by water."

In 5A Thompson on Real Property, § 2721, p 1132, it is said:

"When government lands have been disposed of in conformity to a line appearing on an official plat of the government survey, approved by the surveyor general, the location of the line shown on the official plat is controlling."

In 6 Thompson on Real Property, § 3332, p 529, it is said:

"As a general rule where by the original survey and government plat a tract of land appears to have as its boundary a body of water, such body of water is a natural monument, and will constitute the boundary, however distant or variant from the position indicated for it by the meander line, and hence will control as a call of the survey over either distances or quantity of land designated in the conveyance or on the government plat."

In 5A Thompson on Real Property, § 2725, p 1158, it is said:

"Where natural objects are called for, the lines of the patent must substantially conform to them at the expense of courses and distances, and distances may be shortened or lengthened in order to conform the location of the patent to and with the natural objects called for."

In *Bransfield* v. *Wallace,* 195 Mich 41, it was said:

"In such action, where the finding of the court was based upon a plat made by the government's surveyor, which is presumed to be correct, and which there was evidence to sustain, it not being within the province of this Court to weigh the evidence *pro* and *con,* the finding of the court will not be reversed." (Syllabus 2.)

In the *Bransfield Case,* plaintiff, the owner of government lots 1 and 2, sought ejectment against defendants, the owners of government lot 3. Lots 1 and 2 were shown on the original government plat to be on the north side of Twin lake. Lot 3 on the same plat was shown to be on the south side. Plaintiff claimed that lots 1 and 2 included all the land and water that would be embraced if the lines of his property were so extended as to make the description thereof the northeast quarter of said section 2, and that to reach the south boundary thereof he could extend the lines of his subdivisions into and across the entire width of the lake, thereby excluding defendants from the water frontage of said lot 3 as shown by the government plat. The Court there said (pp 47, 48):

"While the meander lines of the government plat might not be controlling in case an error was shown in the original survey, yet in the absence of such showing the lines will be presumed to be correct. * * *

"The property in question was conveyed by the government not as fractional parts of the NE 1/4 of section 2, but as lots 1 and 2 of that section. There is nothing in the record to indicate that the government intended to convey any land south of the lake, but the evidence and the presumption of law indicate the contrary, and that no mistake was made. But it is said that the plaintiff is short in his acreage; that is not a controlling consideration."

In the instant case the property in question was conveyed by the government not as fractional parts, but as lots 3 and 4. There is nothing in the record to indicate that the government intended to convey any land south of the lake as lot 3, but the evidence and presumption of law indicate the contrary.

In the case of *Brown* v. *Milliman,* 119 Mich 606, 611, 612, the Court said:

"In *County of St. Clair* v. *Lovingston,* 23 Wall (90 US) 46, 62 (23 L ed 59), Justice Swayne said:

" 'It is a universal rule that course and distance yield to natural and ascertained objects. A call for a natural object, as a river, a spring, or even a marked line, will control both course and distance.'

"Practically the same language is used by Justice CHAMPLIN in *Turner* v. *Holland,* 65 Mich 453.

"In *Gilman* v. *Riopelle,* 18 Mich 145, 164, 165, Justice COOLEY said:

" 'Where definite and permanent boundaries are given, the deed must be held to convey all the land within those boundaries, notwithstanding the quantity is much greater than that mentioned. This is on the familiar principle that the incorrect portion of the description is to be rejected where that which remains is sufficient, and that definite and permanent monuments are to control distance and quantity.'

"See *Bruckner's Lessee* v. *Lawrence,* 1 Doug (Mich) 19, 29, and cases there cited; *Morrow* v. *Whitney,* 95 US 551 (24 L ed 456), *Forsyth* v. *Smale,* 7 Biss (CCA 7) 201.

"In *Cragin* v. *Powell,* 128 US 691 (9 S Ct 203, 32 L ed 566), it is held that when the general land office has once made and approved a government survey of public lands, and the plats, maps, field notes, and certificates have been filed in the proper office, and the lands are granted according to an official plat of their survey, the plat, with its notes, lines, descriptions, and land-marks, becomes as much a part of the grant, and, so far as limits are concerned, controls as much, as if such descriptive features were

written in the deed or grant. In *Russell* v. *Maxwell Land-Grant Co.*, 158 US 253 (15 S Ct 827, 39 L ed 971), it is held a survey made by the proper officers of the United States, and confirmed by the land department, is not open to challenge by any collateral attack in the courts."

In the case of *Porter* v. *Selleck*, 236 Mich 655, plaintiff acquired title to government lot 13. In 1838 the township itself was surveyed by the government, and the subdivision thereof in 1852, and the plat of the original survey was filed with the general land office. Meander lines were run around Goose lake, a fresh water pond or lake having an area of 133 acres. Lot 13 was bounded on the north and east by the lake. Meandered lot 13 included a tongue or peninsula of land projecting into the lake in a northeasterly direction. The map and survey showed no land or island beyond, nothing to indicate any reservation by the government. The map showed a meander line cut across this peninsula. Lot 13, within its boundaries, contained 39 acres. The portion of the peninsula north of and beyond the meander line contained about 15 acres. Defendant acquired title to this 15 acres from the government and made conveyances. Plaintiff filed an action to quiet title, including the 15 acres. This Court upheld his right to the entire lot 13, including the 15 acres. In doing so, the Court said (pp 660–662):

"In *Mitchell* v. *Smale*, 140 US 406, 414, 412, 413 (11 S Ct 819, 35 L ed 442), it was said, citing cases:
" 'It has been decided again and again that the meander line is not a boundary, but that the body of water whose margin is meandered is the true boundary.'   *   *   *
" 'Our general views with regard to the effect of patents granted for lands around the margin of a nonnavigable lake, and shown by the plat referred to therein to bind on the lake, were expressed in the

preceding case of *Hardin* v. *Jordan,* 140 US 371 (11 S Ct 808, 35 L ed 428), and need not be repeated here. We think it a great hardship, and one not to be endured, for the government officers to make new surveys and grants of the beds of such lakes after selling and granting the lands bordering thereon, or represented so to be. It is nothing more or less than taking from the first grantee a most valuable, and often *the* most valuable part of his grant. Plenty of speculators will always be found, as such property increases in value, to enter it and deprive the proper owner of its enjoyment; and to place such persons in possession under a new survey and grant, and put the original grantee of the adjoining property to his action of ejectment and plenary proof of his own title, is a cause of vexatious litigation which ought not to be created or sanctioned. The pretence for making such surveys, arising from the fact that strips and tongues of land are found to project into the water beyond the meander line run for the purpose of getting its general contour, and of measuring the quantity to be paid for, will always exist, since such irregular projections do always, or in most cases, exist.' "

In *Arnold* v. *Brechtel,* 174 Mich 147, 159, 160, Justice KUHN said:

"Brewster, in his work on Conveyancing § 96, pp 115, 116, said:

" 'Where, as is often the case, the map does not correctly represent the actual portion of land as staked out or otherwise marked on the earth, and there is a conflict between the map and the monuments on the land, the monuments will control the description. These monuments on the land are facts. Plats and maps and notes regarding them are but descriptions which serve to assist in ascertaining the facts. Parol evidence will therefore be received to show that the map as drawn does not correspond with the survey as made and marked on the ground.'

"In the case of *Palmer* v. *Dodd,* 64 Mich 474, 475, this Court said:

" 'The meanders have no significance as boundaries, and are not intended as such. They are run simply to afford a means of computing the area contained in the fraction which the United States requires payment for on sale of the public domain.'
\*   \*   \*

"In the case of *Brown* v. *Parker,* 127 Mich 390, 392, cited by defendant, this court said:

" 'The meander lines of rivers and inland lakes, where the title to the bed is in the riparian owner, are of comparatively little significance, and it has frequently been said that they were not run to bound the possessions of the riparian owner, whose title might extend beyond them.' "

In *Woodbury* v. *Venia,* 114 Mich 251, 257, 258, Justice Long said:

"It is a well-settled law in this State that monuments control courses and distances, and that, when monuments and measurements vary, the monuments always control; but this reference is to monuments and measurements made by the original survey. Courses and distances would not be controlled by monuments made by some person unauthorized to make them; and the whole trouble with defendant's contention is that he was unable to locate the northeast corner of section 3, unable to show that the north and south highway was on the section line between 2 and 3, or that these division fences upon section 3 were located with reference to any measurements from the true northeast corner of section 3. He found a stone at that corner, but there is no showing that it was one of the original monuments marking the corner. On the other hand, the testimony of the plaintiff's surveyor is that he was able to find and locate upon the ground the southeast corner of section 34, and that, in accordance with the original survey, and following the field notes with courses and distances eastward 6–14/100 chains, he

discovered evidences of an old stake in the ground, and located that as the northeast corner of section 3. There was no evidence in this case of any monuments shown by the defendant which the court was bound to instruct the jury would be better evidence of the actual location of the northeast corner of section 3 than the surveys and measurements made by the plaintiff's surveyors.     *   *   *

"If Mr. Winney and the other surveyors with him found the original corner as established by the United States survey of section 34, and then followed the field notes which located the northeast corner of section 3, it would necessarily fix and determine that corner of section 3, and Winney and the other surveyors claim that they found evidences of the old stake there."

In this case the line as meandered by the government surveyors and followed by plaintiff Lyman Poch* from the government surveyors' field notes is substantially the same as the actual waters' edge.

We believe that the east boundary line of government lot 4, section 32, town 34 north, range 4 east, extends from a point on the south boundary line of said section 32 which is equally distant from the intersection therewith of the quarter line running north and south through said section and the southwest corner of said section and runs thence north in a straight line to the waters' edge of Lake Nettie.

We think, therefore, that the court was wrong in granting the motion to dismiss since plaintiffs had established a prima facie case for the ejectment of defendants.

---

* "Q. Have you had occasion to follow the meander of the lake as set out in the government field notes?

"A. Yes.

"Q. From what point did you start?

"A. I started from the point toward,—the same point the government engineer started from. And that would be the north,—west corner of this section we are speaking of. That is 32, isn't it? Where the north line, going west, of section 32 intersects the lake."

The order of dismissal is reversed and the cause remanded for a new trial in accordance with this opinion. Costs in favor of appellants.

Dethmers, C. J., and Carr, Kelly, Smith, Edwards, and Voelker, JJ., concurred.
Black, J., did not sit.